FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

FEB 1 7 2006
Stephan Harris, Clerk
Cheyenne

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| CORONADO OIL COMPANY, | ) |
| | ) |
| Plaintiff/Appellant, | ) |
| | ) |
| vs. | ) Case No. 05-CV-042-B |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| THE INTERIOR, | ) |
| | ) |
| Defendant/Appellee. | ) |

**Order Reversing and Remanding Decision of
the Interior Board of Land Appeals**

This matter comes before the Court on Coronado Oil Company's appeal from a decision of the Interior Board of Land Appeals, 164 I.B.L.A. 107 (Dep't Interior November 30, 2004), affirming a decision of the Wyoming State Office, Bureau of Land Management, which declared a noncompetitive oil and gas lease held by Coronado terminated due to cessation of production. After considering the appeal, reviewing the materials on file, hearing oral argument, and being fully advised of the premises, the Court **FINDS** and **ORDERS** as follows:

### *STATEMENT OF PARTIES AND JURISDICTION*

Plaintiff Coronado Oil Co. is a private corporation

headquartered in Colorado. Its principal business is petroleum and natural gas exploration and extraction. The United States Department of the Interior ("DOI") is an agency of the United States. Its primary mission is to protect and provide access to the natural and cultural heritage of the United States. The Bureau of Land Management ("BLM") is the agency within the DOI that manages 261 million surface acres of the nation's public lands, including the oil and gas leases on those federal lands. Decisions regarding oil and gas leases on federal lands made by the BLM may be appealed through administrative processes to the Interior Board of Land Appeals ("IBLA" or the "Board"). When an administrative appeal is made, the Board is the final decision-maker for the DOI.

This Court takes jurisdiction over this appeal from the IBLA's decision under 28 U.S.C. 1331 for review under 5 U.S.C. §§ 701-706 (the "Administrative Procedures Act" or "APA").

## *FACTUAL BACKGROUND*

## I.   Acquisition of the Lease and Subsequent Oil and Gas Production

Coronado first acquired noncompetitive oil and gas lease WYW-24093-A ("the Lease") for land in Hot Springs County, Wyoming, on July 1, 1970. A.R. 00059. The term of the Lease was 10 years "and so long thereafter as oil or gas is produced in paying quantities."

2

Coronado Oil Company, 164 I.B.L.A. at 108 (citing 30 U.S.C. §
226(e)); see also A.R. 00053-54 (lease expiration date of May 31,
1980).    In August 1980, BLM extended the Lease for two years
because active drilling operations were in progress at the Lease's
Blume-Government No. 1 Well ("the Blume Well").    A.R. 51.    The
Blume Well was the only producing well on the Lease.

The Blume Well began to produce natural gas and oil in 1981,
and the U.S. Geological Survey then issued a production memorandum
finding that the well was capable of production in paying
quantities.    Coronado Oil Company, 164 I.B.L.A. at 108 (citing
Coronado's Statement of Reasons for Appeal); A.R. 00085.   In 1982,
the Lease entered into its extended term by reason of production as
provided for by the Mineral Leasing Act, 30 U.S.C. § 226(e).   Id.
at 108, 112.

From 1981 through September 1999, sales of oil and gas from
the Blume Well totaled $1,170,580.69 and federal royalties paid,
including minimum royalties, totaled $144,827.37.[1]   A.R. 00019-20

---

[1] According to the IBLA decision, the extent of oil and gas
production from the Blume Well after 1981 was unclear in the BLM
case file, so the IBLA assumed Coronado's representations about
that production were true.   The administrative record before this
Court also is unclear about oil and gas production after 1981, so
the Court assumes for the purposes of this appeal that Coronado's
description of the Blume Well's production is accurate.

3

(Coronado's Petition for Stay). Coronado claims revenues to date represent only 20 percent of the anticipated revenues from the Lease. A.R. 00085 (Coronado's Statement of Reasons on Appeal). Coronado further claims that revenues to date were produced with a total investment by Coronado of $772,038.65 in drilling, completing, and equipping the Lease and the Blume Well. A.R. 00018-19 (Coronado's Petition for Stay).

## II.  Cessation of Oil and Gas Production

Between 1981 and 1993, the Blume Well produced four to five barrels of oil per day ("BOPD") with approximately three percent water. A.R. 00085 (Coronado's Statement of Reasons for Appeal). Production problems began on August 12, 1993, when production dropped to 1.61 BOPD with 51.4 percent water. Id. Production later dropped to 0.47 BOPD with 62 percent water. Id. The pump eventually failed and was pulled and replaced on September 18, 1996. Id. According to Coronado, the Blume Well thereafter produced 99.8 percent water. Id.

Although Coronado's own statements suggest that production may have ceased in 1996, the IBLA found that oil and gas production ceased in August 1997. Coronado Oil Company, 164 I.B.L.A. at 114. This finding was based upon a statement made by the BLM's Worland

4

Field Office Manager.  A.R. 00030.

**III. Coronado's Attempts to Restore Oil and Gas Production**

From September 1996 through May 1998, Coronado claims it attempted to restore oil and gas production by aggressively pumping down the water.  A.R. 85-86 (Coronado's Statement of Reasons on Appeal).  The Blume Well's water pit threatened to overflow in May 1998, so Coronado sought permission from the BLM to double the size of the pit but permission was denied.[2]  Id. at 86.  The water pit did not overflow because equipment failure caused the well to be shut down.  Id.

Earlier, in June 1997, Coronado had sampled the produced water from the Blume Well and found that it was suitable for discharge. A.R. at 85 (Coronado's Statement of Reasons on Appeal); A.R. 157 (Coronado's NPDES Application for Permit to Discharge Produced Water).  Given the quality of the produced water and BLM's denial of permission to expand the well's water pit, Coronado devised a plan to restore oil and gas production by pumping out the water and discharging it into nearby Cottonwood Creek.  A.R. 86, 155.  To implement this plan lawfully, Coronado determined it would need a

---

[2]  The date of this denial is not included in the administrative record.

5

National Pollutant Discharge Elimination System ("NPDES") water discharge permit from the Wyoming Department of Environmental Quality ("Wyoming DEQ") as required by the federal Clean Water Act. A.R. 86. Coronado does not state when this plan was made, but it was sometime between May 1998 and May 1999. See Id.; A.R. 00150 ("[BLM] records indicate that Coronado . . . has been working on a permit for additional water disposal since May 1998."). The record in this case does not indicate any drilling or reworking activity on the Lease and does not indicate any attempt to apply for the needed NPDES discharge permit between May 1998 and May 1999.

## IV. BLM's May 1999 Notice and Coronado's Subsequent Attempts to Acquire a NPDES Permit

On May 5, 1999, the BLM notified Coronado that the agency's records indicated that the Lease did not contain a well capable of production in paying quantities and was subject to automatic termination unless Coronado demonstrated that there was a well capable of production in paying quantities on the Lease or Coronado commenced reworking and drilling operations on the Lease within 60 days. A.R. 00147. Coronado received BLM's May 5th notice on May 7th, so the 60 days granted by the notice to commence reworking and drilling operations on the Lease ended on July 6, 1999. Coronado Oil Company, 164 I.B.L.A. at 109.

6

On May 19, 1999, Coronado claims to have contacted Roger Bankert of the BLM's Worland Field Office to explain its plan to restore oil and gas production by obtaining a NPDES water discharge permit. (Appellant's Br. 4.) Coronado alleges Bankert accepted the plan and requested documentation.   (Id.)   During the next week, Coronado retained a compliance consultant to assist Coronado in obtaining the required NPDES permit.   (Id.)

On July 6, 1999, the 60 days granted in BLM's May 5th notice ended.   Coronado Oil Company, 164 I.B.L.A. 107.   That same day Coronado sent a sundry notice to BLM saying that Coronado was preparing its NPDES permit application to be filed with the Wyoming DEQ, and that, when approved, this permit would allow Coronado to bring the Blume Well back into production.   Id.; A.R. 00148.   BLM returned Coronado's July 6th notice unapproved on July 23rd because there was no documentation showing Coronado was actively pursuing the water discharge permit.   A.R. 00150.   BLM noted that Coronado had been working on the permit since May 1998.   Id.   BLM told Coronado that the required documentation must be submitted by August 6, 1999, or the Lease would automatically terminate.   Id. Coronado did not receive BLM's July 23rd notice until August 3, 1999, because John Bollenbacher, Coronado's President and the sole

person responsible handling such matters, was absent from the country. (Appellant's Br. 4-5.)

On August 5, 1999, Coronado mailed its water discharge permit application to the Wyoming DEQ and faxed a copy of the application to the BLM. Coronado Oil Company, 164 I.B.L.A. 107; A.R. 00151-157. Coronado claims to have discussed the matter at that time with Charles Wilkie in the BLM's Worland Field Office, informing him of Roger Bankert's May 19th acceptance of Coronado's plan to restore the Blume Well. (Appellant's Br. 5.) Coronado also claims that Wilkie said "the lease is now okay" on August 6, 1999. (Appellant's Br. 5.)

## V.  Coronado's Receipt of the First NPDES Permit and Subsequent Efforts to Change that Permit's Expiration Date

Coronado received a copy of the proposed NPDES permit and the public notice of its intended issuance from Wyoming DEQ in January 2000. (Appellant's Br. 5.) On March 6, 2000, Coronado received the final approved NPDES permit for wastewater discharge into Cottonwood Creek. A.R. 00159-160. The permit had become effective on February 1, 2000, and would expire on January 31, 2001. A.R. 00160. Although it had the needed discharge permit, Coronado did not begin pumping water from the Blume Well at that time. (Appellant's Br. 5.)

8

On April 21, 2000, the BLM sent Coronado a letter requiring
Coronado to provide documentation within 5 days showing that it had
received the water discharge permit or that the delay was due to
causes beyond its control. A.R. 00162. This letter also informed
Coronado that if the requested information was not received or it
was determined that the permit was not being pursued diligently by
Coronado the lease would be terminated by BLM's letter of May 5,
1999. Id. Coronado received the April 21st letter on April 24,
2000, so Coronado's reply was required by April 29th.

In response to BLM's demand for documentation, Coronado faxed
BLM a copy of its discharge permit on April 28, 2000. A.R. 00158-
161. At that time, Coronado explained that the January 31, 2001,
expiration date on the permit was an "error" and it was seeking a
"correction."[3] A.R. 00158. Despite Coronado's having received a

---

[3] Despite Coronado's characterization of the January 31, 2001,
expiration date, the record in this matter is insufficient to
determine whether that expiration date was in fact erroneous.
Coronado apparently considered the expiration date erroneous
because the permit and its accompanying statement of basis
contained inconsistent statements regarding the permit's
expiration. The permit and its statement of basis both stated that
it would expire in one year's time on January 31, 2001, but the
statement of basis also said that the permit was being issued for
two years and would be renewed thereafter if future testing showed
that the discharge did not endanger the designated uses of the
stream. A.R. 00159-160. These statements are clearly
inconsistent, but there is no indication that the two year term was
correct and the January 31, 2001, expiration date was incorrect.

9

copy of the permit in January, there is no evidence in the record indicating that Coronado discovered this inconsistency or attempted to resolve it before Coronado asked Wyoming DEQ to correct the expiration date on April 25th -- the day after it received a letter from BLM asking for documentation showing Coronado had received its discharge permit.   A.R.   00158,   00167.   Nonetheless,   once discovered, Coronado told BLM that it would not act upon the discharge permit until the expiration date was changed.   A.R. 00158, 00165.

Apparently dissatisfied with Coronado's response, BLM sent a letter to Coronado on May 8th that required Coronado to show why the water discharge permit was inadequate to allow the company to resume production and prove Coronado had requested a correction. A.R. 00163.  Coronado replied on May 9th, telling BLM that it could not begin pumping the water out of the Blume Well with only a one year discharge permit because of the significant investment in facilities required by the permit.  A.R. 00165-66.  Coronado also faxed a copy of a letter from Coronado's compliance consultant saying that he had requested a correction from Wyoming DEQ on April 25th.  A.R. 00167.

10

Clearly dissatisfied, BLM sent an order to Coronado on May 17th that required Coronado to return the Blume Well to production by July 12, 2000, or the Lease would terminate. A.R. 00169. As grounds for this order, BLM cited Coronado's failure to diligently pursue correction of the NPDES permit because the company took no action to correct the permit until after receipt of BLM's April 21st letter even though the permit was received on March 6th. Id. Coronado received this order on May 22, 2000. Id. On that same day, Coronado learned that Wyoming DEQ would not correct the expiration date on the NPDES permit without a public notice period, and therefore the new permit could not be issued before July 12th. (Appellant's Brief, p. 7.) Coronado subsequently received from BLM a verbal extension of the July 12th deadline to August 1, 2000. A.R. 00030.

On June 16th, Wyoming DEQ sent a proposed corrected NPDES permit to Coronado with an effective date of August 1, 2000, and an expiration date of January 31, 2002. A.R. 00170-72. Coronado sent BLM a copy of this proposed permit on June 17th. A.R. 00173-78. Coronado also told the BLM that Coronado would begin to install the surface facilities necessary to bring the Blume Well back into production. A.R. 00173.

11

## VI.  Coronado's Subsequent Attempts to Bring the Blume Well Back into Production in Paying Quantities and BLM's Termination of the Lease

Coronado claims to have taken various actions to prepare the Lease for utilization of the second discharge permit during June, July, and August 2000.  First, Coronado claims to have sought verbal approval from BLM's Worland Field Office on June 29th for construction of surface facilities, but BLM told Coronado to send a sundry notice. (Appellant's Br. 8.)  Second, Coronado claims to have sent a copy of the second discharge permit to its site superintendent on July 5th, telling him to get the facilities ready.  (Id.)  Third, Coronado claims its compliance consultant met with field personnel on July 11th to discuss the facilities construction and sampling required by the corrected NPDES permit. A.R. 00196 (Coronado's August 17, 2000, sundry notice).  Fourth, Coronado claims to have installed a new 1½ inch pump in the Blume Well.  Id.  Fifth, Coronado claims to have pumped 1,435 barrels of water from the Blume Well between July 20 and August 15, 2000.  Id. Finally, Coronado claims hydrocarbons were produced by the Blume Well on August 15, 2000.  Id.

The only action confirmed by the record is Coronado's sending of a sundry notice to BLM's Worland Field Office on July 25, 2000,

12

seeking approval to construct a produced water pit drain, a flow line into the Cottonwood Creek drainage, and various erosion control measures. A.R. 00179-83. It appears this sundry notice was verbally denied the next day. (Appellant's Br. 8.)

According to the IBLA's decision in this case, BLM personnel visited the Blume Well site on July 31, 2000. They allegedly found the well was pumping, the water pit was full, the fill line valves to the tank battery were closed, the heater treater was unlit, and no oil was being produced. Coronado Oil Company, 164 I.B.L.A. at 111. Unfortunately, the only reference to this inspection in the record is in the BLM's Worland Field Manager's August 2, 2000, letter to the Wyoming State Director recommending that the lease be terminated: "On July 31, 2000 the lease was inspected and the well was pumping but the tanks were isolated from the well." A.R. 00030. Furthermore, Coronado claims to have been unaware of this site visit until the IBLA issued its 2004 decision. (Appellant's Br. 8.) Nonetheless, Coronado does not expressly challenge the truth of these observations.[4] In addition, these observations are generally consistent with Coronado's own summary of the its activities on the Lease at the time. See A.R. 00196-97 (Coronado's

---

[4] Coronado does argue that reference to this inspection and facts not otherwise in the record was arbitrary and capricious.

13

August 17, 2000, sundry notice).

On August 2, 2000, BLM's Worland Field Manager sent a memorandum to the Wyoming State Director recommending that the Lease be terminated due to cessation of production. A.R. 00030. BLM's Wyoming State Office subsequently issued a decision finding the Lease terminated by cessation of production effective April 24, 2000. A.R. 00028-29. Coronado received notice of the termination on August 18, 2000.

## PROCEDURAL BACKGROUND -- AGENCY DECISIONS

### I.   BLM's Decision to Terminate the Lease

The BLM decision terminating Coronado's lease was expressly based upon regulation 43 C.F.R. § 3107.2-2, which states that

[a] lease which is in its extended term because of production in paying quantities shall not terminate upon cessation of production if, within 60 days thereafter, reworking or drilling operations on the lease hold are commenced and are thereafter conducted with reasonable diligence during the period of nonproduction. The 60 day period commences upon receipt of notification from the authorized officer that the lease is not capable of production in paying quantities.

43 C.F.R. § 3107.2-2 (48 Fed. Reg. 33,662, July 22, 1983, as amended at 53 Fed. Reg. 17,357, May 16, 1988; 53 Fed. Reg. 22,840, June 17, 1988). This rule deals with cessation of production on oil and gas leases and is meant to implement provisions of the

14

Mineral Leasing Act, 30 U.S.C. § 226. See Merit Productions, et al., 144 I.B.L.A. 156, 160-67 (Dep't Interior May 29, 1998) (Burski, A.J., concurring) (discussing the contradictions between 43 C.F.R. §§ 3107.2-2 and the Mineral Leasing Act, 30 U.S.C. § 226(i)). As discussed below, the 60 day notice provision of this regulation is a problem because it appears to contradict parts of section 226(i).

The BLM decision first stated that the Lease was in its extended term by reason of production and that there was no well on the Lease capable of producing hydrocarbons in paying quantities. A.R. 00028. BLM went on to explain the specific reasons for the termination:

By certified letter of May 5, 1999, the Worland Field Office notified the operator that they were allowed sixty days in which to commence reworking or drilling operations. The notice was received by the operator on May 7, 1999. The operator/lessee[] was granted an extension on July 23, 1999, to submit documentation concerning a water disposal permit. On April 21, 2000, a follow-up letter was sent to the operator and received on April 24, 2000. After many attempts by the Worland Field Office to give the operator a chance to submit the necessary paper work for another extension or to commence drilling operations on the last producing well, no reworking or drilling operations commenced within the specified time frame. Therefore, the term of lease WYW24093A is exhausted and the lease is held to have terminated by cessation of production effective April 24, 2000.

15

Id. Coronado was informed that the decision could be appealed to the IBLA, but Coronado was never informed that it could ask for a hearing on the factual issue of whether there was a well capable of producing hydrocarbons in paying quantities on the Lease.

## II. IBLA's Decision Affirming the BLM Decision

Coronado timely filed an appeal with the IBLA, arguing that termination of the lease violated the provisions of the Mineral Leasing Act, 30 U.S.C. § 226(i), and that the permitting delays caused by the Wyoming DEQ constituted a constructive suspension under Copper Valley Machine Works, Inc. v. Andrus, 653 F.2d 595 (D.C. Cir. 1981), which held that drilling restrictions imposed upon a lease by the Secretary of the Interior constituted a de facto suspension and justified an extension of that lease. Basing its decision on the Mineral Leasing Act, the IBLA rejected Coronado's arguments and affirmed termination of the Lease.

### STANDARD OF REVIEW

For purposes of judicial review of decisions originally made by the BLM, the IBLA is the final decision maker for the DOI so it is the IBLA decision that is subject to review by this Court. IMC Kalium Carlsbad, Inc. v. Interior Bd. of Land Appeals, 206 F.3d 1003, 1009-10 (10th Cir. 2000). An IBLA decision will be set aside

16

"only if it is arbitrary, capricious, otherwise not in accordance with law, or not supported by substantial evidence." American Colloid Co. v. Babbitt, 145 F.3d 1152, 1154 (10th Cir. 1998) (citing 5 U.S.C. § 706 and Hoyl v. Babbitt, 129 F.3d 1377, 1382 (10th Cir. 1997)). Agency action is not arbitrary or capricious if it has a reasoned basis and is supported by facts in the record. Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574-75 (10th Cir. 1994). Although the substantial evidence requirement for IBLA decisions is expressed as if it were independent from the arbitrary or capricious standard, it is not: an agency action that is not supported by substantial evidence is also not supported by facts in the record, which means it is arbitrary and capricious. See Id. Thus, an IBLA decision must be affirmed if it is not arbitrary or capricious and is otherwise in accordance with law.

Agency action is not arbitrary or capricious if it has a reasoned basis and is supported by facts in the record. Id. Agency action has a reasoned basis if the agency considered all relevant factors and there has been no clear error of judgment. Id. Generally, agency action fails for lack of a reasoned basis

if the agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before

17

the agency, or is so implausible that it could not be
ascribed to a difference in view or the product of agency
expertise.

Id. (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,
463 U.S. 29, 43 (1983)).

Agency action is supported by the facts in the record where
there is substantial evidence to support the decision.  Id. at
1575.  Substantial evidence is evidence sufficient "to justify, if
the trial were to a jury, refusal to direct a verdict on a factual
conclusion," Hoyl, 129 F.3d at 1383, or "such relevant evidence as
a  reasonable  mind  might  accept  as  adequate  to  support  a
conclusion."  Four B Corp. v. NLRB, 163 F.3d 1177, 1182 (10th Cir.
1998) (internal quotation marks and citation omitted).

## *ANALYSIS*

**I.   The IBLA's refusal to consider whether Coronado's efforts to
obtain  a  water  discharge  permit  constituted  reasonably
diligent efforts to rework the Blume Well was arbitrary and
capricious.**

In its decision to affirm the termination of Coronado's lease,
the IBLA refused to consider whether Coronado's efforts to obtain
a water discharge permit after May 5, 1999, constituted reasonably
diligent efforts to rework the Blume Well under section 226(i). The
Court finds this refusal to be arbitrary and capricious because the
BLM lawfully granted Coronado an additional period to commence

18

reworking or drilling operations under section 226(i) in its May 5, 1999, order.

### A.   Lawful Termination of Federal Oil and Gas Leases under the Mineral Leasing Act

Under the Mineral Leasing Act, oil and gas leases on federal lands are effective for a primary term of ten years and thereafter enter into an extended term lasting so long as oil or gas is produced in paying quantities. 30 U.S.C. § 226(e). The lease's extended term automatically terminates by operation of law when paying production ceases. Id.; see also 43 C.F.R. 3107.2-1; Great Western Petroleum and Refining Co., 124 I.B.L.A. 16, 24 (Dep't Interior August 19, 1992). Automatic termination is subject to exceptions provided for in 30 U.S.C. 226(i):

> No lease issued under this section which is subject to termination because of cessation of production shall be terminated for this cause so long as reworking or drilling operations which were commenced on the land prior to or within sixty days after cessation of production are conducted thereon with reasonable diligence, or so long as oil or gas is produced in paying quantities as a result of such operations. No lease issued under this section shall expire because operations or production is suspended under any order, or with the consent, of the Secretary. No lease issued under this section covering lands on which there is a well capable of producing oil or gas in paying quantities shall expire because the lessee fails to produce the same unless the lessee is allowed a reasonable time, which shall be not less than sixty days after notice by registered or certified mail, within which to place such well in

19

producing status or unless, after such status is
established, production is discontinued on the leased
premises without permission granted by the Secretary
under the provisions of this Act.

30 U.S.C. § 226(i). The IBLA properly interprets section 226(i) to
create three independent exceptions to automatic termination. See,
e.g., Great Plains Petroleum, Inc., 117 I.B.L.A. 130, 132 (Dep't
Interior 1990); Max Barash, 6 I.B.L.A. 179, 181-82 (Dep't Interior
1972). The IBLA's mistake is to treat these independent exceptions
as if they were also mutually exclusive and cannot work together to
grant an operator or lessee a new period to commence reworking or
drilling operations on a lease that has fallen into nonproduction.

**B. The IBLA's piecemeal application to section 226(i) caused
it to erroneously hold that the BLM cannot grant a new
period to begin reworking or drilling operations.**

In its appeal to the IBLA, Coronado argued that it had been
reasonably diligent in working to bring the Blume Well back into
production and therefore termination was unlawful. A.R. 00095-
00103. The Board analyzed this argument exclusively under the
first sentence of section 226(i), which provides that "[n]o lease
. . . which is subject to termination because of cessation of
production shall be terminated . . . so long as reworking or
drilling operations which were commenced on the land prior to or
within sixty days after cessation of production are conducted

20

thereon with reasonable diligence, or so long as oil or gas is produced in paying quantities as a result of such operations." Id. In doing so, the IBLA properly interpreted the first exception to mean that a lease terminates unless, "within 60 days after cessation of production, reworking or drilling operations are begun on the lease and thereafter conducted with reasonable diligence during the period of nonproduction . . . ." Coronado Oil Co., 164 I.B.L.A. at 113. The Board then reasoned that when the Blume Well ceased to produce in August 1997, Coronado was required, if it wanted to preserve its lease, to commence reworking or drilling operations within 60 days and then continue production with reasonable diligence until oil or gas was produced in paying quantities. Id. at 115. The Board found that Coronado failed to begin reworking or drilling operations within the statutory period: "Indeed, it was not until 60 days after receipt of BLM's May 5, 1999, order/letter notifying Coronado that . . . the lease contained no well capable of production in paying quantities, that appellant prepared to seek a water disposal permit." Id. at 115-16.

In completing its analysis, the Board held that the BLM's May 5th order could not vary the terms of section 226(i) and therefore could not grant a new period to begin reworking or drilling

21

operations. Id. at 116 (citing International Metals & Petroleum
Corp., 158 I.B.L.A. 15, 20-21 n. 6 (2002)). For this reason, the
Board refused to consider whether Coronado's efforts to obtain a
NPDES discharge permit from Wyoming DEQ after May 5th "constituted
reasonably diligent efforts to rework the well." Id. This
interpretation of section 226(i) is erroneous because it
exclusively focuses on the first sentence of section 226(i) and
ignores the plain language of the entire section.

There is no doubt that an agency action or decision, such as
the BLM's May 5th order in this case, cannot change the terms of a
statute -- such power belongs to Congress. But, that truth does
not mean that the BLM is powerless to grant a new period to begin
reworking or drilling operations. In fact, the opposite is true
because Congress has effectively granted the agency that power in
the second sentence of section 226(i): "[n]o lease issued under
this section shall expire because operations or production is
suspended under any order, or with the consent, of the Secretary."
30 U.S.C. § 226(i). The Secretary's power to consent to a
cessation of production, as exercised through her authorized
officers, allows her to accept a prior period of nonproduction and
grant a new period to begin reworking or drilling operations. To

22

hold otherwise is to ignore the plain language of section 226(i). Therefore, the IBLA's holding that section 226(i) categorically prevents the BLM from granting a new 60 day period for reworking or drilling operations to resume production is an incorrect interpretation of the statute and is therefore not in accordance with the law.

The IBLA's erroneous interpretation of section 226(i) combines with the BLM's current regulations purporting to implement this statute -- specifically 43 C.F.R. § 3107.2-2 -- to create an unfair situation. The first sentence of section 226(i) does not require any notice be given to an operator/lessee after the cessation of production; rather, the 60 day period to begin reworking or drilling operations runs from the cessation of production. Despite this statutory language, 43 C.F.R. § 3107.2-2 purports to commence the 60 day period for reworking or drilling operations only after notice: "The 60 day period commences upon receipt of notification from the authorized officer that the lease is not capable of production in paying quantities." 43 C.F.R. § 3107.2-2. The IBLA's solution to the apparent contradiction between the statutory language and the regulatory language, which it applied in this case, has been to ignore the regulatory language. See Merit

Productions, et al., 144 I.B.L.A. 156, 160-67 (Dep't Interior May 29, 1998) (Burski, A.J., concurring) (recognizing contradiction, declaring the regulatory language a nullity, and recommending adjudication solely on the statutory language). Nonetheless, the agency has not changed the regulatory language and cites this language repeatedly in its communications to Coronado in this case. See A.R. 00143 (BLM decision terminating the Lease for cessation of production); A.R. 00147 (BLM's May 5, 1999, order informing Coronado that the Lease did not contain a well capable of production). Thus, Coronado was invited by the BLM's regulation to believe that it had a right to 60 days to begin reworking and drilling operations on its nonproducing lease when the agency -- through the IBLA's interpretation of the statutory language -- could in fact terminate the lease at its discretion without any review of either Coronado's efforts to bring the Lease back into production or the BLM's conduct towards Coronado during that time.[5] In this situation, the agency enjoys a measure of unconstrained discretion that is not justified by law. Moreover, the same result seems unavoidable for any other operators or lessees who have

---

[5] The Court makes no findings regarding the result of a review of Coronado's efforts to bring the Lease back into production or the BLM's conduct towards Coronado during that time. This review must be conducted by the IBLA on remand.

allowed a productive lease to fall into nonproduction: the operator is invited by the language of the regulation to invest in reworking operations under the belief that he continues to enjoy the protections of section 226(i) for another 60 days even though the agency can terminate the lease at any time -- regardless of its promises to the contrary -- and that termination will be upheld by the IBLA on the language of the statute.   This patently unfair result is a product of the IBLA's erroneous and unlawful application of section 226(i).   By acknowledging that section 226(i) grants the agency the power to consent to a cessation of production, the regulatory language of section 3107.2-2 does not contradict section 226(i) because it effectively exercises the Secretary's power to consent to certain periods of nonproduction. Thus, reading the first two sentences of section 226(i) together, the Secretary and her authorized officers have the power to grant an operator or lessee additional time to begin reworking or drilling operations on a nonproducing lease.   This is the only fair result.

C.   **The IBLA erroneously found that there was no evidence in the record to indicate that the Secretary consented to cessation of production on the Lease.**

Without more, this Court's finding that the IBLA's piecemeal

25

approach to section 226(i) is unlawful is insufficient to change the result in this case because the IBLA also found that there was no evidence in the record to indicate that the BLM had consented to the cessation of production on the lease. If there is no consent to the cessation of production, the proper holistic interpretation of section 226(i) changes nothing because valid consent to the initial period of nonproduction is required to grant a new period for reworking or drilling operations. The question then is whether there is substantial evidence in the record to support the IBLA's factual finding.

The Government urges this Court to not address this question, arguing that Coronado is precluded from asserting that the BLM consented to the cessation of production as defined by section 226(i) because this argument was not made before the IBLA. It is true that a reviewing court generally should not consider arguments that are first made on appeal unless exceptional circumstances justify consideration. Wilson v. Hodel, 758 F.2d 1369, 1372-73 (10th Cir. 1985). However, in this case this general rule does not apply for two reasons. First, the IBLA chose to make a finding regarding the BLM's consent to the cessation of production. This finding was used to justify its refusal to consider the application

26

of the consent exception to this case, and it is subject to judicial review. See Coronado Oil Company, 164 I.B.L.A. at 113 (discussing lack of evidence for consent to cessation of production). Second, there are exceptional circumstances in this case because of the unfairness caused by the IBLA's application of the statutory language of section 226(i) and the BLM's continued reliance upon the regulatory language of 43 C.F.R. § 3107.2-2. Therefore, the Court will address the question of whether the BLM consented to cessation of production on the Lease.[6]

---

[6] Regarding this question, Coronado makes two arguments that the Court rejects. First, Coronado urges this Court to accept evidence of mere acquiescence as valid consent under section 226(i). The Court will not do so. If mere acquiescence constitutes consent for section 226(i) purposes, then any failure to contact an operator or lessee who has allowed a lease to fall into nonproduction would qualify as consent. This would effectively require notice before automatic termination of a lease for nonproduction, and, under the plain language of section 226(i), notice is not required unless there is a well capable of production on the lease. The Secretary or her authorized officers must actively consent to cessation of production; inaction is insufficient.

Second, Coronado urges this Court to apply Copper Valley Machine Works, Inc. v. Andrus, 653 F.2d 595 (D.C. Cir. 1981), and find that there was a de facto suspension of the Lease because the federal Clean Water Act required Coronado to acquire a NPDES discharge permit to implement its plan to bring the Blume Well back into production. Coronado argues this de facto suspension should automatically grant it an extension of any production deadlines until the issuance of the discharge permit. In Copper Valley, the court held that when the Secretary of the Department of Interior "prevents timely access to [an oil and gas] lease, a de facto suspension occurs to which the lessee is entitled as a matter of

In its decision, the IBLA cited the fact that "the focus of
the BLM's orders to Coronado [had] been the need to resume
production." Coronado Oil Company, 164 I.B.L.A. at 113. Whatever
the "focus" of the BLM's orders to Coronado, the plain language of
the BLM's May 5, 1999, order informing Coronado that the Lease did
not contain a well capable of production clearly stated that
Coronado had 60 days to begin reworking or drilling operations.
A.R. 00147. The express grant of 60 days to take appropriate

---

right." Hoyl, 129 F.3d at 1380 (citing Copper Valley, 653 F.2d at
602-05). Coronado's argument confuses the Secretary's power to
suspend lease requirements for environmental reasons, which was
recognized by Copper Valley, with the Secretary's obligation to
suspend certain lease requirements where the Secretary's own orders
have restricted timely access to the lease. The latter does not
apply to the current case because Coronado was not required to seek
the NPDES discharge permit by the Secretary, nor was Coronado
denied timely access to the Lease by the Secretary.

The fact that Coronado was required to comply with both the
Mineral Leasing Act and the Clean Water Act simultaneously does not
in and of itself grant them a de facto suspension of the deadlines
created by the Mineral Leasing Act or deadlines imposed by the
Secretary. Coronado, like any other corporation that enjoys the
protections provided by the laws of this nation, must organize its
affairs to simultaneously comply with legal obligations imposed by
any number of applicable laws. There is nothing unfair or
arbitrary about this fact.

Although there is no legal right to an extension of the Lease
because of the NPDES permit, Coronado's efforts to secure the NPDES
discharge permit should certainly be a part of the factual
determination of whether Coronado commenced reworking and drilling
operations on the Lease within the required time and whether
Coronado thereafter conducted such operations with reasonable
diligence. This is the issue that must be decided by the IBLA on
remand.

28

action, which was accompanied by citation to the BLM's own regulations, clearly and unequivocally communicated the agency's consent to any prior period of nonproduction. The meaning of any subsequent communications between the parties and the agency's focus in those communications on the need to resume production can only be understood within this context. Therefore, the Court finds that the evidence in the record shows that the BLM validly consented to the period of nonproduction prior to May 5, 1999.[7] The Board's conclusion to the contrary is directly contradicted by facts in the record and is therefore not supported by substantial evidence; as a result, this finding was arbitrary and capricious and is hereby reversed.

## II. Coronado was not unlawfully denied notice and an opportunity for a hearing on the issue of whether the Lease contained a well capable of production.

In its IBLA appeal, Coronado argued that it was entitled to a reasonable time to place the Blume Well in producing status, and the reasonable time should extend until after the Wyoming DEQ issued the corrected NPDES discharge permit. The IBLA properly considered this argument under the third sentence of section 226(i)

---

[7] The Court makes no findings regarding whether the agency consented to any periods of nonproduction after May 5, 1999.

because this is the only exception that entitles a lessee to a reasonable time to resume production.  The Board correctly held that an operator or lessee is only entitled to a reasonable time to place a well back into producing status if there is a well capable of production in paying quantities on the lease.

A "well capable of production in paying quantities" must be presently able to produce oil or gas -- potential for production is insufficient.  The Polumbus Corp., 22 I.B.L.A. 270, 271-72 (1975). Therefore, a well is not capable of production in paying quantities "where substantial pumping of water from the well is required before oil could be produced in paying quantities." Steelco Drilling Corp., 64 I.D. 214 (1957).  The Board found that the Blume Well was not capable of production at the relevant time because water still needed to be pumped from it.  The Board then held that without a well capable of production on the Lease, Coronado was not entitled to a notice allowing them a reasonable time to bring the Blume Well into production. Coronado Oil Co., 164 I.B.L.A. at 115.

Coronado now objects to the fact that it did not receive notice that it could request a hearing before an administrative law judge to determine whether there was a well capable of production on the Lease, as required by BLM regulations.  See, e.g., Daymon D.

Gilliland, 108 I.B.L.A. 144, 148. However, notice of the ability to request a hearing is only required where the operator or lessee offers credible evidence to suggest that the well is capable of immediate production. In this case, there is no evidence to suggest Coronado contested the status of the Blume Well. There is also no evidence to suggest that the Blume Well was capable of production before water was pumped from it. Therefore, the agency's failure to give Coronado notice of an opportunity to request a hearing on the status of the Blume Well was not arbitrary or capricious.

**III. The IBLA's recitation of facts not otherwise in the record was not arbitrary or capricious in this case.**

In its decision, the IBLA cited certain evidence from a July 31, 2000, site inspection of the Blume Well and the Lease. Specifically, the IBLA stated that the well was pumping, the water pit was full, the fill line valves to the tank battery were closed, the heater treater was unlit, and no oil was being produced. Coronado Oil Company, 164 I.B.L.A. at 111. The only reference to this inspection in the record is in the BLM's Worland Field Manager's August 2, 2000, letter to the Wyoming State Director recommending that the lease be terminated. A.R. 00030. Inexplicably, this reference does not include all of the facts

recited by the IBLA. Coronado claims to have been unaware of this site visit until the IBLA issued its 2004 decision. (Appellant's Br. 8.) Coronado argues use of this evidence was prejudicial and therefore arbitrary and capricious.

This Court does not approve of citing evidence otherwise absent from an administrative record and would likely find such conduct arbitrary or capricious if an agency decision relied upon such evidence to make its decision. That said, the IBLA's reference to the site inspection in this case was not arbitrary or capricious because the IBLA did not rely upon this evidence in reaching its decision, which entirely depended upon events that occurred prior to the summer of 2000. The Court cautions the agency to carefully document the evidence it uses to decide this case on remand.

## *CONCLUSION*

For all of the reasons stated above, the Court hereby **ORDERS** the Department of Interior's termination of noncompetitive oil and gas lease WYW-24093-A, as decided in Coronado Oil Company, 164 I.B.L.A. 107, **REVERSED IN PART** and **REMANDS** this matter to the Interior Board of Land Appeals for appropriate proceedings to decide **(1)** whether Coronado commenced reworking or drilling

32

operations after May 5, 1999, within the 60 days granted to Coronado to do so, and **(2)** whether such reworking or drilling operations, if any, were conducted with reasonable diligence thereafter.

Dated this ___6th___ day of February, 2006.

<u>                                   </u>
UNITED STATES DISTRICT JUDGE

33